**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



—————————————————————x
:
TODD J. BIEDERMAN, Individually and on :
behalf of all others similarly situated, :
:
          Plaintiff, :    Case No.
:
    v. :    CLASS ACTION
:
BALTIC TRADING LIMITED, PETER C. :    DEMAND FOR JURY TRIAL
GEORGIOPOULOS, BASIL MAVROLEON, :
HARRY PERRIN, EDWARD TERINO, :
GEORGE WOOD, GENCO SHIPPING & :
TRADING LIMITED, and POSEIDON :
MERGER SUB LIMITED, :
:
          Defendants. :
:
—————————————————————x

### CLASS ACTION COMPLAINT

Plaintiff, by and through his attorneys, alleges upon personal knowledge as to himself,

and upon information and belief based upon, among other things, the investigation of counsel as

to all other allegations herein, as follows:

### SUMMARY OF THE ACTION

1. This is a stockholder class action brought by Plaintiff on behalf of the

stockholders of Baltic Trading Limited ("Baltic Trading" or "Company") against Baltic Trading,

the board of directors of Baltic Trading ("Board" or "Individual Defendants"), Genco Shipping

& Trading Limited ("Genco"), and Poseidon Merger Sub Limited ("Merger Sub") to enjoin the

sale of the Company ("Proposed Transaction") to Genco and Merger Sub as detailed herein.

2.     On April 8, 2015, Baltic Trading announced that it had entered into a definitive agreement with Genco ("Merger Agreement") under which Genco, through Merger Sub, would acquire all of the outstanding shares of Baltic Trading in a transaction involving stock consideration. Under the terms of the Merger Agreement, Baltic Trading stockholders will receive 0.216 of a share of Genco for each common share of Baltic Trading owned at closing, with fractional shares to be settled in cash. In addition, Genco has entered into an agreement to acquire all of the shares of two single-purpose entities that are wholly owned by Baltic Trading, each of which owns one Capesize drybulk vessel, for an aggregate purchase price of $68.5 million, subject to reduction for approximately $41 million of outstanding first-mortgage debt of such single-purpose entities that is to be guaranteed by Genco and an adjustment for the difference between such single-purpose entities' current assets and total liabilities as of the closing date. It is expected that the Proposed Transaction will close late in the third quarter of 2015.

3.     In facilitating the acquisition of Baltic Trading by Genco for inadequate consideration and through a flawed process, each of the Defendants (defined herein) breached and/or aided the other Defendants' breaches of their fiduciary duties.

4.     Moreover, the terms of the Proposed Transaction were designed to ensure a transaction with Genco on terms preferential to Genco, and to subvert the interests of Plaintiff and the other public stockholders of Baltic Trading. The Board has further breached its fiduciary duties by agreeing to preclusive deal protection devices in the Merger Agreement including, *inter alia*, (a) a "no-shop" provision which prohibits the Company from, among other things, soliciting or negotiating any alternative proposals; (b) a "matching rights" provision which grants Genco the right to revise its proposal in response to a superior alternative proposal; (c) an "information

rights" provision that entitles Genco to receive a copy of any alternative proposal as well as the material terms thereof; (d) a voting agreement locking up 13.87% of the Company's outstanding common shares in favor of the Proposed Transaction; and (e) a "termination fee" provision that requires the Company to pay a termination fee in connection with the Merger Agreement equal to $3,250,000 if the Proposed Transaction is terminated under certain circumstances. These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals. Thus, the Board compounded its breaches by agreeing to these unreasonable deal protection devices that preclude other bidders from making a successful competing offer for the Company.

5.      On May 4, 2015, Genco filed a Form S-4 Registration Statement ("Registration Statement") with the U.S. Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction in order to solicit the Company's shareholder's votes in support of the Proposed Transaction. However, the Registration Statement fails to disclose material information to the shareholders of the Company so that the shareholders may make an informed decision regarding the Proposed Transaction. Specifically, the Registration Statement omits and/or misrepresents material information concerning, among other things: (a) the sale process for the Company; (b) management's financial projections; and (c) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinion provided by the Company's financial advisors, Blackstone Advisory Partners LP ("Blackstone") and Peter J. Solomon Company, L.P. ("PJSC") along with the financial analysis provided by Houlihan Lokey Capital, Inc. ("Houlihan Lokey").

6.      For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover

damages resulting from the Individual Defendants' (as defined herein) violations of their fiduciary duties and the federal securities laws.

## PARTIES

7.      Plaintiff is, and at all relevant times was, a continuous stockholder of Baltic Trading.

8.      Baltic Trading is a Republic of the Marshall Islands corporation with its principal executive offices located at 299 Park Avenue, 12th Floor, New York, New York 10171.

9.      Defendant Peter C. Georgiopoulos has served as Chairman of the Board since 2005.

10.     Defendant Basil Mavroleon has served as a director of the Company since 2010.

11.     Defendant Harry Perrin has served as a director of the Company since 2010.

12.     Defendant Edward Terino has served as a director of the Company since 2010.

13.     Defendant George Wood has served as a director of the Company since 2010.

14.     Defendants Georgiopoulos, Mavroleon, Perrin, Terino, and Wood are collectively referred to herein as the "Board" or the "Individual Defendants."

15.     Defendant Genco is a Republic of the Marshall Islands corporation with its principal executive offices located at 299 Park Avenue, 12th Floor, New York, New York 10171.

16.     Defendant Merger Sub is a Republic of the Marshall Islands corporation and a wholly-owned subsidiary of Genco.

17.     Collectively, Baltic Trading, Genco, the Individual Defendants, and Merger Sub are referred to herein as the "Defendants."

## JURISDICTION

18.     This Court has federal question jurisdiction over this action pursuant to § 27 of

the Exchange Act, as amended, 15 U.S.C. § 78aa, and 28 U.S.C. § 1332.

19.     Venue is proper under 28 U.S.C. § 1391(b)(2) because Baltic Trading's principal executive offices are located at 299 Park Avenue, 12th Floor, New York, New York 10171, and Genco's principal executive offices are located at the same address. In addition, a substantial part of the events or omissions giving rise to the claim occurred in this District. Moreover, each of the Individual Defendants as Company officers and/or directors has extensive contacts within this District.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 on behalf of all holders of Baltic Trading shares who are being and will be harmed by Defendants' actions described below ("Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants.

21.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable. The Company's most recent 10-Q indicates that, as of November 10, 2014, there were 51,205,241 common shares and 6,356,471 shares of Class B stock of Baltic Trading issued and outstanding. The actual number of stockholders of Baltic Trading will be ascertained through discovery.

b.     There are questions of law and fact that are common to the Class, including:

i)      whether the Individual Defendants have breached their fiduciary duties with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

ii)     whether the Individual Defendants have breached their fiduciary duty to obtain the best price available for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

iii)    whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction complained of herein consummated; and

iv)    whether the Individual Defendants misrepresented and omitted material facts in violation of the federal securities laws and in violation of fiduciary duties owed by them to Plaintiff and the other members of the Class.

c.     Plaintiff is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

d.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### A.      Background

22.     Baltic Trading is a New York City-based company incorporated in October 2009 in the Marshall Islands to conduct a shipping business focused on the drybulk industry spot market. The Company formed by Genco Shipping & Trading Limited ("Genco"), an international drybulk shipping company that also serves as the Company's Manager. The Company's fleet currently consists of four Capesize vessels, two Ultramax vessels, four Supramax vessels and five Handysize vessels with an aggregate carrying capacity of approximately 1,221,000 deadweight tons ("dwt"). The average age of the current fleet is approximately 4.3 years, as compared to the average age for the world fleet of approximately nine years for the drybulk shipping segments in which Baltic Trading competes. After the expected delivery of two Ultramax newbuildings that Baltic Trading has agreed to acquire, the Company will own a fleet of 17 drybulk vessels, consisting of four Capesize, four Ultramax, four Supramax and five Handysize vessels with a total carrying capacity of approximately 1,349,000 dwt. The Company's current fleet contains six groups of sister ships, which are vessels of virtually identical sizes and specifications. Baltic Trading believes that maintaining a fleet that includes sister ships reduces costs by creating economies of scale in the maintenance, supply and crewing of the Company's vessels.

23.     On July 2, 2013, Baltic Trading entered into agreements to purchase two Handysize drybulk vessels from subsidiaries of Clipper Group for an aggregate purchase price of

$41 million. The Baltic Hare, a 2009-built Handysize vessel, was delivered on September 5, 2013 and the Baltic Fox, a 2010-built Handysize vessel, was delivered on September 6, 2013. Baltic Trading funded a portion of the purchase price of the vessels using proceeds from the Company's registered follow-on common stock offering completed on May 28, 2013. For the remainder of the purchase price, Baltic Trading drew down $22 million under the Company's secured loan agreement with DVB Bank SE ("$22 Million Term Loan Facility").

24.     On October 31, 2013, Baltic Trading entered into agreements to purchase two Capesize drybulk vessels from affiliates of SK Shipping Co. Ltd. for an aggregate purchase price of $103 million. The Baltic Lion, a 2012-built Capesize drybulk vessel, was delivered on December 27, 2013, and the Baltic Tiger, a 2011-built Capesize vessel, was delivered on November 26, 2013. Baltic Trading funded a portion of the purchase price of the vessels using proceeds from the Company's registered follow-on common stock offering completed on September 25, 2013.  For the remainder of the purchase price, the Company drew down $44 million under the Company's secured loan agreement with DVB Bank SE ("$44 Million Term Loan Facility").

25.     On November 13, 2013, Baltic Trading entered into agreements to purchase up to four 64,000 dwt Ultramax newbuilding drybulk vessels from Yangfan Group Co., Ltd. for a purchase price of $28 million per vessel, or up to $112 million in the aggregate. Baltic Trading agreed to purchase two such vessels, to be renamed the Baltic Hornet and Baltic Wasp, and obtained an option to purchase up to two additional such vessels for the same purchase price, which the Company exercised on January 8, 2014. These vessels are to be renamed the Baltic Mantis and the Baltic Scorpion. The purchases are subject to completion of customary additional documentation and closing conditions. The first of these vessels, the Baltic Hornet, was delivered

8

on October 29, 2014. The Baltic Wasp was delivered on January 2, 2015. The Baltic Scorpion and the Baltic Mantis are expected to be delivered to the Company during the second and third quarters of 2015, respectively.

26.     Baltic Trading seeks to leverage the expertise of Genco and its management to pursue growth opportunities in the drybulk shipping spot market. To pursue these opportunities, Baltic Trading operates a fleet of drybulk ships that transports iron ore, coal, grain, steel products and other drybulk cargoes along worldwide shipping routes. Baltic Trading currently operates all of the Company's vessels on spot market-related time charters, short-term time charters or in vessel pools trading in the spot market. Baltic Trading may also consider operating vessels in the spot market directly based on the Company's view of market conditions. Baltic Trading has financed its fleet primarily with equity capital and have financed the remainder with its revolving credit facility ("2010 Credit Facility"), the $22 Million Term Loan Facility, the $44 Million Term Loan Facility and the 2014 Term Loan Facilities. The $148 Million Credit Facility refinanced the outstanding indebtedness under the 2010 Credit Facility.

27.     Baltic Trading's operations are managed, under the supervision of the Company's Board, by Genco as the Company's Manager. In 2010, Baltic Trading entered into a long-term management agreement ("Management Agreement") pursuant to which the Company's Manager and its affiliates apply their expertise and experience in the drybulk industry to provide Baltic Trading with commercial, technical, administrative and strategic services. The Management Agreement is for an initial term of approximately fifteen years and will automatically renew for additional five-year periods unless terminated in accordance with its terms. Baltic Trading pays its Manager fees for the services it provides to the Company as well as reimburses the Manager for its costs and expenses incurred in providing certain of these services.

28.     On May 28, 2013, Baltic Trading closed an equity offering of 6,419,217 shares of common stock at an offering price of $3.60 per share. Baltic Trading received net proceeds of approximately $21.6 million, after deducting underwriters' fees and expenses. Additionally, on September 25, 2013, Baltic Trading closed an equity offering of 13,800,000 shares of common stock at an offering price of $4.60 per share. The Company received net proceeds of approximately $59.5 million after deducting underwriters' fees and expenses. Also, on November 18, 2013, the Company closed an equity offering of 12,650,000 shares of common stock at an offering price of $4.60 per share and received net proceeds of approximately $55.1 million after deducting underwriters' fees and expenses. Pursuant to the Management Agreement, for so long as Genco directly or indirectly holds at least 10% of the aggregate number of outstanding shares of the Company's common stock and Class B stock, Genco will be entitled to receive at no cost an additional number of shares of Class B stock equal to 2% of the number of common shares issued, other than shares issued under the Company's 2010 Equity Incentive Plan. As a result of the equity offerings on May 28, 2013, September 25, 2013 and November 18, 2013, Genco was issued 128,383, 276,000 and 253,000 shares, respectively, of Class B stock, which represents 2% of the number of common shares issued.

**B.      The Company is Poised for Growth**

29.     A press release dated November 5, 2014 announced Baltic Trading's third quarter 2014 financial results. According to the press release, Baltic Trading declared a $0.01 per share dividend payable on or about November 26, 2014 to all shareholders of record as of November 20, 2014 based on Q3 2014 results. The Company's revenues increased by 10% to $10.0 million for the three months ended September 30, 2014 compared to $9.1 million for the three

months ended September 30, 2013. Baltic Trading President and Chief Financial Officer John Wobensmith assessed the quarter as follows:

> We continued to operate in a challenging dry bulk market in the third quarter and have taken steps to enhance the Company's future prospects. During a time in which we are growing our modern fleet, we continued to successfully access capital and have entered into two credit facilities. We are pleased to have taken delivery of the first of four Ultramax newbuildings in October and look forward to receiving three additional eco-design vessels in the fourth quarter of 2014 and into 2015, as planned. Our expanded fleet and fleet deployment strategy positions the Company to drive future performance and capitalize on improvements in the freight rate environment.

30.     Baltic Trading announced its fourth quarter financial results in a March 2, 2015 press release. According to the press release, EBITDA was $1.4 million for the three months ended December 31, 2014. Baltic Trading President and Chief Financial Officer John Wobensmith assessed the quarter as follows:

> During a challenging drybulk market, we continue to focus on maintaining a cost effective operating platform, providing superior service to leading charterers and successfully accessing capital under favorable terms. Highlighting our strong banking relationships, we commenced 2015 having entered into a new $148 million credit facility, enabling us to refinance the total amount outstanding under the Company's existing facility scheduled to mature in 2016.

31.     On March 30, 2015, the Company issued a press release announcing the financial results for the first quarter of 2015. According to the press release, the Company recorded a net loss for the first quarter of 2015 of $42.4 million, or $0.75 basic and diluted net loss per share. Comparatively, for the three months ended March 31, 2014, the Company recorded a net loss of $3.5 million, or $0.06 basic and diluted net loss per share. Baltic Trading President and Chief Financial Officer John Wobensmith assessed the quarter as follows:

> During the first quarter, we entered into a $148 million credit facility and sold two of our vessels, the Baltic Tiger and the Baltic Lion. We also entered into a definitive merger agreement with Genco Shipping & Trading Limited, which we believe will further enhance our industry leadership.

32.    In light of these factors, the Company is well-positioned to enjoy long-term growth after the Company overcomes its short-term cash flow issues.

**C.    The Flawed Sale Process**

33.    In July 2014, Genco completed its financial restructuring and emerged from Chapter 11 with a restructured balance sheet and a reconstituted board of directors. Following its emergence and in light of the current weakness of the drybulk shipping industry, the Genco board explored ways in which to improve its competitive position, including through potential transactions. During this process, the Genco board and Genco's management identified a business combination with Baltic Trading as a potential means for accomplishing its objectives. On October 2, 2014, in connection with the consideration of a potential transaction with Baltic Trading, the Genco board formed the Genco special committee consisting of James G. Dolphin, Ian Ashby, Eugene I. Davis and Michael J. Leffell. Two members of the Genco board were not included as members of the Genco special committee because they were designees of Centerbridge Partners, L.P., and the Centerbridge Shareholders were also significant investors in Baltic Trading. The Genco board, among other things, authorized the Genco special committee to: establish and direct the process relating to the review and evaluation of the merger; evaluate and negotiate the terms of the merger; negotiate the terms of any definitive agreement with respect to the merger; and report to the Genco board its recommendations and conclusions with respect to the merger, provided that any definitive agreement to effect the merger would require the approval of the Genco board.

34.    Following its formation, the Genco special committee retained Milbank Tweed, Hadley & McCloy LLP ("Milbank Tweed") as its legal advisor and Houlihan Lokey as its financial advisor in connection with the proposed merger and designated Dolphin to act as the

primary point of contact with Baltic Trading and the Genco special committee's advisors regarding the merger. Thereafter, the Genco special committee directed Houlihan Lokey and Milbank Tweed to conduct a due diligence review of Baltic Trading based on publicly available information.

35.     On October 28, 2014, prior to any discussions between the Genco special committee and Baltic Trading, John Wobensmith, the President, Chief Financial Officer, Principal Accounting Officer, Secretary and Treasurer of Baltic Trading (and the Chief Financial Officer of Genco at such time), received an email from a representative of another shipping company ("Company A") inquiring about the possibility of exploring a potential combination with Baltic Trading. On the same day, Wobensmith received an email from a second shipping company ("Company B"), proposing a combination of the two companies. Company B is a company affiliated with Georgiopoulos. Wobensmith subsequently informed the members of the Baltic Trading board about the two inquiries and the Baltic Trading board discussed these two inquiries in an executive session on November 4, 2014.

36.     On November 17, 2014, at the direction of the Genco special committee, Dolphin delivered a non-binding proposal letter to Wobensmith, for delivery to the Baltic Trading board, proposing a business combination between the two companies. The letter stated that a business combination would create operational efficiencies, reduce overall administrative expenses, increase the float and liquidity for shareholders and achieve other benefits for both companies. The letter proposed an exchange ratio that would be based on the net asset values ("NAV") of the two companies at the closing of the merger (a "floating exchange ratio"), after applying a 6% discount to Baltic Trading's NAV to reflect the discount at which Baltic Trading's shares were trading. The letter stated that the merger would be conditioned on approval by holders of a

majority of the outstanding shares of Baltic Trading common stock not beneficially owned by Genco and the listing of Genco common stock on the NYSE. Dolphin indicated that Genco would not be supportive of a change of control transaction between Baltic Trading and a third party.

37.    Edward Terino, George Wood and Harry Perrin, members of the Baltic Trading board, held a telephonic meeting on November 19, 2014 to discuss the Genco proposal and the inquiries from Company A and Company B. Georgiopoulos did not participate in the meeting because of his relationship with Genco and Company B. Basil Mavroleon, the remaining Baltic Trading director, was unavailable for the meeting. Representatives of Kaye Scholer LLP ("Kaye Scholer") were invited to participate in the meeting, given that Baltic Trading's regular outside counsel, Kramer Levin Naftalis & Frankel LLP ("Kramer Levin"), also represented Genco. At the meeting, the directors determined that the Baltic Trading special committee should be formed to consider the Genco proposal, the inquiries received from Company A and Company B and other strategic alternatives available to Baltic Trading (including not engaging in any transaction). Subject to none of the individuals having any material conflicts, it was determined that the Baltic Trading special committee members should include Terino, Wood, Perrin and Mavroleon. The directors considered the prior engagements of Mavroleon and Perrin as members of the Genco board and determined that since they were no longer Genco directors, there would be no conflict of interests if Mavroleon and Perrin served as members of the Baltic Trading special committee. Terino and Perrin were asked to propose potential financial advisors for the Baltic Trading special committee to consider following its formation, and the directors discussed the possibility of retaining two financial advisors. Kaye Scholer was retained as legal counsel to the Baltic Trading special committee.

38.     Terino, Wood, Perrin and Mavroleon held a telephonic meeting on November 24, 2014 to discuss further evaluation of, and responses to, the Genco proposal and the Company A and Company B inquiries. A representative of Kaye Scholer provided the independent directors with an overview of their fiduciary duties under applicable law. The Kaye Scholer representative questioned the independent directors about any conflicts they might have in considering the Genco proposal, the Company A and Company B inquiries, and other strategic alternatives available to Baltic Trading. Based on the responses of the Baltic Trading special committee members, and information subsequently provided by them, it was determined that no material conflicts existed that would prevent them from effectively serving on the Baltic Trading special committee. At the Baltic Trading special committee meeting, the independent directors discussed the ability of Baltic Trading to pursue a transaction with a party other than Genco in light of Genco's voting control of, and other contractual relationships with, Baltic Trading. The independent directors also considered whether the Management Agreement might be terminable as a result of Genco's recent bankruptcy and other events, and whether Genco's share ownership position could be diluted to less than 10% of Baltic Trading's outstanding capital stock, which would cause the Class B Stock having 15 votes per share to convert to Baltic Trading common stock having one vote per share. The independent directors noted that pursuant to a Subscription Agreement, dated March 3, 2010, between Baltic Trading and Genco ("Subscription Agreement"), Genco was entitled to receive additional shares of Class B Stock equal to two percent of the number of shares of Baltic Trading common stock issued by Baltic Trading in any future share issuance. The independent directors expressed the view that the possibility of diluting Genco should be explored in more detail if discussions with Genco progressed further, as a means to enhance Baltic Trading's negotiating leverage in such discussions. Wood reported

that members of Baltic Trading management had met with representatives of Company A, who stated that Company A was only interested in a transaction with Baltic Trading if Genco would also be involved in that transaction.

39.    Resolutions forming, and providing authority to, the Baltic Trading special committee were adopted by the Baltic Trading board on December 9, 2014.

40.    A meeting of the Baltic Trading special committee was held at the offices of Kaye Scholer in New York City on December 10, 2014. Representatives of Blackstone and representatives of another investment bank presented their qualifications and experience to the Baltic Trading special committee, and addressed questions relating to potential conflicts that they may have. At a telephonic meeting of the Baltic Trading special committee held on December 11, 2014, the Baltic Trading special committee determined to engage Blackstone as its financial advisor, subject to negotiation of an engagement letter on terms satisfactory to the Baltic Trading special committee.

41.    The Baltic Trading special committee held several telephonic meetings between December 12, 2014 and December 18, 2014 to discuss proposed responses to the Genco proposal and the inquiries from Company A and Company B, Baltic Trading's liquidity issues, and other matters. At a telephonic meeting of the Baltic Trading special committee held on December 17, 2014, representatives of Blackstone advised the Baltic Trading special committee members that NAV was the most common valuation methodology used in the shipping industry. The Baltic Trading special committee members also discussed the current liquidity issues facing Baltic Trading and various options that could be pursued to address those issues, including an equity offering, debt issuance and the sale of vessels. No decision was made as to any course of action,

as the Baltic Trading special committee determined to continue to gather additional information about the Genco proposal and the inquiries from Company A and Company B.

42.     At a telephonic meeting of the Baltic Trading special committee held on December 18, 2014, the Baltic Trading special committee adopted a charter governing the conduct of its business, approved draft responses to the letters from Company A, Company B and Genco, and authorized Wood to forward such responses to the applicable companies. The response letters to Company A and Company B informed those companies that the Baltic Trading special committee had been formed with authority to discuss their respective inquiries and requested further information regarding any potential transaction. The response to Genco informed Genco of the formation of the Baltic Trading special committee and its authority, inquired whether Genco would consider exploring other strategic transactions involving Baltic Trading, including the sale of Baltic Trading stock held by Genco or Genco voting in favor of an alternate sale of Baltic Trading, and sought confirmation that the condition stated in Genco's November 17th proposal letter to Baltic Trading that a transaction between Genco and Baltic Trading would be subject to approval by Baltic Trading's shareholders (excluding Genco and its affiliates) was irrevocable and non-waivable. Wood forwarded the letters the same day. Dolphin sent a response on behalf of Genco to Baltic Trading's December 18th letter later the same day. Genco's response reiterated that Genco would not be supportive of a transaction between Baltic Trading and a third party and confirmed that any transaction between Genco and Baltic Trading would be conditioned on the approval of holders of a majority of outstanding shares of Baltic Trading common stock and Class B Stock, excluding Genco and its subsidiaries.

43.     The Baltic Trading special committee held a telephonic meeting on December 19, 2014 to discuss Genco's December 18th letter, the inquiries received from Company A and

Company B, and the feasibility and advisability of an equity financing by Baltic Trading. The Baltic Trading special committee members noted that Baltic Trading's stock currently traded at a significant discount to NAV, and Blackstone indicated that an equity issuance would likely be at a discount to Baltic Trading's stock price. The Baltic Trading special committee was of the view that such an issuance would not be in the best interests of Baltic Trading and its shareholders. The Baltic Trading special committee members also noted that a transaction with either Company A or Company B would likely involve Baltic Trading acquiring, either through a merger or an asset acquisition, Company A, or Company B, as applicable, through the issuance by Baltic Trading of capital stock in such a transaction, given that Baltic Trading would likely be unable to finance any cash transaction, and that certain mergers of Baltic Trading with Company A or Company B would require Genco's approval, which Genco had indicated it was unwilling to give. The Baltic Trading special committee noted that such a share issuance would likely be at a discount to Baltic Trading's share price, which traded at a significant discount to Baltic Trading's NAV. Moreover, a transaction with Company B would not assist Baltic Trading to improve its liquidity position.

44.     The meeting between representatives of the special committees of Genco and Baltic Trading and their respective financial advisors took place telephonically on December 22, 2014. At the meeting, representatives from Houlihan Lokey described in detail the approach proposed by the Genco special committee in its November 17th proposal and the rationale with respect thereto. Wood and Perrin provided an update to the Baltic Trading special committee regarding such discussions at a telephonic meeting of the Baltic Trading special committee held later that same day. The Baltic Trading special committee members considered information provided by Blackstone related to due diligence issues that could impact the exchange ratio in a

transaction between Baltic Trading and Genco, and appraisers that could potentially be engaged to perform an appraisal of the two companies' fleets. The Baltic Trading special committee members authorized Blackstone to engage in further discussions with Houlihan Lokey to further explore Genco's approach with respect to valuation. The Baltic Trading special committee authorized Kaye Scholer to engage in discussions with Milbank Tweed regarding which Baltic Trading shareholders should be excluded from the minority for purposes of a "majority-of-the-minority" condition.

45.     The Baltic Trading special committee held a telephonic meeting on December 31, 2014 to consider a presentation by Blackstone with respect to the strategic alternatives potentially available to Baltic Trading in light of its current and forecasted liquidity situation and need for financing and a financial analysis of Genco's proposal. The Baltic Trading special committee members discussed and considered the relative advantages and disadvantages of a sale of vessels, a debt financing, an equity financing, and a strategic combination with another company. Blackstone provided an overview of Genco's proposal based on its discussions with Houlihan Lokey. Blackstone noted that Genco's analysis included a $21 million reduction in Baltic Trading's NAV equal to the amount of the termination fee that was calculated to be payable under the Management Agreement should it be terminated in certain circumstances ("Management Agreement Termination Fee"), assumed that Baltic Trading's fleet should be valued at a 6% discount to NAV, and attributed no value to Baltic Trading's NYSE listing (the "Listing Credit"). The Baltic Trading special committee members expressed their view that the $21 million reduction for the Management Agreement Termination Fee was inappropriate in a transaction between the two companies, and that it was possible that Baltic Trading had a right to terminate the Management Agreement, without payment of any fee, as a result of Genco's recent

bankruptcy proceedings and other events. The Baltic Trading special committee members also disagreed with Genco's attribution of a 6% discount to NAV, and expressed the view that Baltic Trading should receive a Listing Credit. The Baltic Trading special committee members directed Blackstone to convey those positions to Houlihan Lokey.

46.     The Baltic Trading board and Baltic Trading special committee held telephonic meetings on January 6, 2015 to further consider Baltic Trading's worsening liquidity position and to discuss issues surrounding dilution of Genco to under 10% share ownership in order to force a conversion of its high voting Class B Stock into one vote per share capital stock. Following a presentation by Blackstone to the Baltic Trading special committee regarding possible alternative solutions to Baltic Trading's liquidity issues, the Baltic Trading board, upon the recommendation of the Baltic Trading special committee, concluded that the sale of one or more vessels was in the best interests of Baltic Trading, and that Baltic Trading's management should commence a process to explore a vessel sale.

47.     The Baltic Trading special committee held a telephonic meeting on January 7, 2015 to discuss the status of discussions between Blackstone and Houlihan Lokey, and to discuss further the feasibility of diluting Genco below 10% share ownership. At the meetings, Blackstone presented a potential framework for resolving the unresolved valuation issues with the Genco special committee. The Baltic Trading special committee authorized Blackstone to contact Houlihan Lokey in order to discuss the unresolved valuation issues in accordance with that framework. In addition, the Baltic Trading special committee reviewed the Management Agreement and Baltic Trading's rights under that agreement, and the impact of issuing additional equity to dilute Genco's and its subsidiaries' ownership of Baltic Trading capital stock to below 10%. Diluting Genco below 10% share ownership, which would force the conversion of Genco's

Class B Stock with 15 votes per share to ordinary voting common stock, would terminate Genco's voting control over Baltic Trading, and would potentially permit Baltic Trading to enter into a merger or other strategic transaction with a third party that Genco opposed. Blackstone discussed with the Baltic Trading special committee the magnitude of such an issuance. After considering the discussions with Kaye Scholer and Blackstone, and in light of its prior deliberations, including with respect to the Subscription Agreement, the pricing of the Baltic Trading shares and other factors, the Baltic Trading special committee members were of the view that it was not practicable to dilute Genco below 10% share ownership and, consequently, it would not be productive for the Baltic Trading special committee to solicit interest from other parties with respect to a potential business combination with Baltic Trading.

48.     On January 7, 2015, on behalf of the Baltic Trading special committee, representatives of Blackstone sent to representatives of Houlihan Lokey a counterproposal regarding the methodology for determining NAV that also assumed the merger would use a floating exchange ratio based on the relative NAVs of Genco and Baltic Trading but differed from the proposal set forth in Genco's November 17th proposal in the following respects: it eliminated the 6.0% discount to Baltic Trading's NAV in calculating the exchange ratio; it added $40 million as a Listing Credit; and it eliminated the Management Agreement Termination Fee.

49.     The Baltic Trading special committee held a telephonic meeting on January 8, 2015 to receive updates from Blackstone and Kaye Scholer. Blackstone reported that the Genco special committee believed that Baltic Trading was not entitled to any Listing Credit because Genco would be able to list its stock on a national securities exchange independently, and did not need to rely on Baltic Trading's existing NYSE listing. Kaye Scholer updated the Baltic Trading special committee on its discussions with Milbank Tweed concerning the appropriate

composition of the minority to be included in a "majority-of-the-minority" vote of Baltic Trading shareholders. The Baltic Trading special committee directed Kaye Scholer representatives also to discuss with Milbank Tweed the potential ability of Baltic Trading to terminate the Management Agreement, without paying the Management Agreement Termination Fee, given Genco's bankruptcy proceedings and other events. If Baltic Trading had the unilateral ability to terminate the Management Agreement without payment of the Management Agreement Termination Fee, Genco would likely be unable to reflect any Management Agreement Termination Fee in its valuation of Baltic Trading.

50.     On January 12, 2015, Wood received an email from a representative of Company B in response to an email Wood sent on December 18, 2014 seeking more information. At a telephonic meeting held later that day, the Baltic Trading special committee authorized Wood to continue discussions with Company B. Wood updated the Baltic Trading special committee regarding his discussions with Company B during two telephonic meetings of the Baltic Trading special committee held on January 14, 2015. Wood reported that Company B was interested in engaging in a transaction with Baltic Trading valued based on the relative NAVs of the respective companies. The Baltic Trading special committee noted that a transaction with Company B would not address Baltic Trading's liquidity issues, and that an acquisition of Company B would likely require approval of Baltic Trading's shareholders, which Genco would be able to block given its voting control over Baltic Trading. The Baltic Trading special committee directed Wood not to engage in further discussions with Company B until Company B had retained a financial advisor, which Company B had indicated was in process.

51.     On January 15, 2015, Baltic Trading and Genco signed the non-disclosure agreement. In lieu of including a standstill in the non-disclosure agreement, the Genco special

committee agreed to send a letter to the Baltic Trading special committee, which was dated January 16, 2015, re-confirming that the exclusive manner in which a merger would be consummated would be subject to the non-waivable condition that it be approved by the non-Genco Baltic Trading shareholders. On the same day, the Baltic Trading special committee held a telephonic meeting to receive a presentation from Blackstone on valuation scenarios.

52.     Wood met with Dolphin in person on the evening of January 15, 2015 to discuss valuation issues. At the meeting, Wood and Dolphin agreed to further discuss the following principal transaction terms with the Baltic Trading special committee and the Genco special committee, respectively: Baltic Trading would be valued at 100% of NAV; the Listing Credit would be valued at $3 million; and Baltic Trading's NAV would be reduced by $21 million on account of the Management Agreement Termination Fee. At a telephonic meeting of the Baltic Trading special committee held the following day, the Baltic Trading special committee determined that the transaction terms discussed between Wood and Dolphin were unacceptable. As an alternative, the Baltic Trading special committee instructed Blackstone to prepare an analysis of the value that Baltic Trading shareholders might receive in the event of a liquidation of Baltic Trading. Wobensmith attended part of the meeting at the invitation of the Baltic Trading special committee to report on Baltic Trading's liquidity and current market conditions for vessel sales, and he indicated that vessel values were unpredictable but generally declining. On January 16, 2015. Terino contacted PJSC regarding the Baltic Trading special committee retaining PJSC as a second financial advisor. Thereafter, Kaye Scholer and PJSC negotiated the terms of PJSC's engagement agreement.

53.     The Baltic Trading special committee held a telephonic meeting on January 19, 2015 during which it received a presentation by Blackstone regarding the potential liquidation

value of Baltic Trading. Georgiopoulos was present for a portion of the telephonic meeting at which a status report of the transaction was discussed. Thereafter, the Baltic Trading special committee concluded that a liquidation of Baltic Trading, assuming the sale of all of its vessels, was not in the best interests of its shareholders because of the likely protracted nature of the process, the possibility that vessel values would further decline during that process, the possibility that amounts realizable in that process would not approximate Baltic Trading's NAV and because as a result thereof Baltic Trading shareholders would no longer be able to maintain their investment in the sector. The Baltic Trading special committee considered proposing that the Management Agreement Termination Fee could be included as an asset of Genco instead of a liability of Baltic Trading (which would reduce the negative impact on the exchange ratio, as Genco's NAV was significantly higher than Baltic Trading's) and directed Blackstone to deliver to Houlihan Lokey a revised proposal that included a deduction of $6.5 million to Genco's NAV for the market value of warrants issued by Genco during its reorganization (if not cancelled as a part of the merger); a value of $8 million added to Genco's NAV attributable to the Management Agreement Termination Fee; and the allocation to Baltic Trading's NAV of an incremental value of $15 million for the Listing Credit. Blackstone delivered the revised proposal to representatives of Houlihan Lokey on January 21, 2015.

54.    On January 28, 2015, the Genco special committee met telephonically, together with representatives of Milbank Tweed and Houlihan Lokey, to discuss the status of the negotiations with Baltic Trading and potential approaches for expediting the consummation of the merger and obtaining the support of Baltic Trading and the non-Genco Baltic Trading shareholders. In light of the continued deterioration of vessel values, and the disproportionate effect of such market trends on the NAV of Baltic Trading because of its substantial leverage,

the Genco special committee discussed the possibility of offering an exchange ratio that was fixed on the date of entry into a definitive merger agreement (a "fixed exchange ratio"), as opposed to a floating exchange ratio. At the conclusion of the meeting, the Genco special committee approved the delivery of a counterproposal to the Baltic Trading special committee premised on a fixed exchange ratio of 0.216. Representatives of Houlihan Lokey communicated this proposal to representatives of Blackstone on January 30, 2015.

55.     In late January, the financial advisor for Company B contacted Blackstone with summary background information regarding Company B. Blackstone updated the Baltic Trading special committee regarding this information at telephonic meetings of the Baltic Trading special committee held in early February. The Baltic Trading special committee determined, in light of the Baltic Trading special committee's prior deliberations concerning the issues associated with a transaction with Company B, it was not in the best interests of Baltic Trading and its shareholders for the Baltic Trading special committee to continue discussions with Company B at that time. Company A did not, after it indicated that it desired a transaction with Baltic Trading to include Genco, provide the Baltic Trading special committee with additional information concerning its inquiry.

56.     At the same telephonic meetings of the Baltic Trading special committee, representatives of Blackstone provided a financial overview of the Genco special committee's counterproposal as well as the valuations of the Baltic Trading and Genco fleets. Agreeing upon an overall fixed exchange ratio without individual components presented a means of breaking the negotiating impasse between the parties over the appropriate value to be attributed to any Listing Credit or the Management Agreement Termination Fee. The Baltic Trading special committee directed Blackstone to propose to Houlihan Lokey and the Genco special committee a fixed

25

exchange ratio of 0.238, which was communicated by representatives of Blackstone to representatives of Houlihan Lokey on February 3, 2015.

57.     Throughout February, representatives of Blackstone, under the direction of the Baltic Trading special committee, and representatives of Houlihan Lokey, under the direction of the Genco special committee, engaged in numerous communications regarding the fixed exchange ratio. In late February, representatives of Houlihan Lokey, at the direction of the Genco special committee, proposed a fixed exchange ratio of 0.2265. At a telephonic meeting of the Baltic Trading special committee held on February 23, 2015, the Baltic Trading special committee determined that the proposed exchange ratio was within an acceptable range, subject to further analysis. On February 27, 2015, representatives of Blackstone, on behalf of the Baltic Trading special committee, indicated to representatives of Houlihan Lokey that such exchange ratio was acceptable.

58.     At telephonic meetings of the Baltic Trading special committee held in late February, the Baltic Trading special committee considered the current status of efforts of Baltic Trading's management to sell two vessels and the liquidity issues faced by Baltic Trading. The Baltic Trading special committee determined that it should become more actively involved in the vessel sale process. The Baltic Trading board adopted resolutions to expand the authority of the Baltic Trading special committee to cover certain aspects of the vessel sale process on March 11, 2015.

59.     At a telephonic meeting of the Baltic Trading special committee held on March 9, 2015, Wobensmith advised the Baltic Trading special committee that Baltic Trading management was in the process of soliciting offers for vessels. Wobensmith advised the Baltic Trading special committee that Baltic Trading management (in consultation with Wood, the

chairman of the Baltic Trading special committee) had invited the Genco special committee to make an offer for vessels but had not yet received an offer from the Genco special committee.

60.     On March 10, 2015, members of the Genco special committee (with Leffell and Dolphin present in person, and Ashby present via telephone) and members of the Baltic Trading special committee (with Perrin, Wood and Terino present in person and Mavroleon present via telephone) met at Milbank Tweed's offices in New York City to negotiate outstanding issues. At the meeting, the parties confirmed that a fixed exchange ratio of 0.2265 was acceptable to both parties. The parties also agreed on the outside date for completion of the merger, that Genco would use commercially reasonable efforts to expand the Genco board to include one member of the Baltic Trading special committee (which would not be a condition to completion of the merger), and that Genco would be willing to purchase two Baltic Trading vessels in order to address Baltic Trading's liquidity issues. The parties also agreed that the merger would be conditioned on approval by holders of a majority of the voting power of Baltic Trading common stock and Class B Stock, and by a majority of the voting power of the Baltic Trading common stock held by the non-Genco Baltic Trading shareholders. Further, it was agreed between the parties that Centerbridge would be the only Genco shareholder asked to execute a voting agreement with respect to its Baltic Trading and Genco shares for the reasons previously discussed by the parties' legal advisors.

61.     At a March 16, 2015 telephonic meeting of the Baltic Trading special committee, Kaye Scholer described the various issues remaining under the draft merger agreement and the Baltic Trading special committee provided direction to Kaye Scholer as to how to resolve those issues. Kaye Scholer reported regarding certain of the due diligence issues relating to the merger, including those relating to certain conditions to the merger. On March 19, 2015, the Baltic

27

Trading special committee held a telephonic meeting to discuss the vessel sales and the related marketing efforts and valuations. Georgiopoulos and Wobensmith attended that meeting and reported to the Baltic Trading special committee regarding the vessel sales efforts.

62.     After discussions with Wobensmith on behalf of Baltic Trading, the Genco special committee explored the possibility of purchasing two of Baltic Trading's vessels. On March 17, 2015, the Genco board expanded the authority of the Genco special committee to allow the Genco special committee to engage in negotiations with Baltic Trading with respect to the purchase of two of Baltic Trading's vessels, subject to the Genco board's final authority to approve such purchase. Negotiations relating to the vessel sale transaction and the stock purchase agreement relating thereto ("Stock Purchase Agreement") continued in parallel with discussions regarding the merger through April 7, 2015.

63.     On March 23, 2015, the Genco board met telephonically to discuss the merger agreement and the terms of the merger, as well as the potential purchase of the two vessels from Baltic Trading. At a telephonic meeting of the Baltic Trading special committee held on the same day, Wood reported to the Baltic Trading special committee that Dolphin, on behalf of the Genco special committee, had communicated to Wood that Genco was willing to purchase two vessels from Baltic Trading for an aggregate purchase price equal to the aggregate appraised value provided by an independent valuation firm of the two vessels. However, Genco was reevaluating the proposed exchange ratio in light of the vessel sales and the continued deterioration of vessel values in the vessel marketplace. The Baltic Trading special committee requested that Blackstone update its analysis of the valuations of the two companies in order to take into account the proposed vessel sales. Wobensmith reported on the impact of the contemplated vessel sales in the vessel marketplace, in particular on the market value of other vessels, and on

Baltic Trading's lenders and credit agreements. It was contemplated that the vessel sales to Genco would likely be accomplished through the sale of the two single purpose entities that own those vessels, with the loans to those entities remaining in place, and that Genco would replace Baltic Trading as the guarantor of those loans.

64.     At a telephonic meeting of the Baltic Trading special committee held on March 25, 2015, Wood informed the Baltic Trading special committee that, based on communications with Dolphin, Genco was willing to purchase the two vessels (through the acquisition of the single purpose entities that owned the vessels) for an aggregate price of $68.5 million (reduced by the amount of debt and other liabilities of the single purpose entities), but would require a decrease in the fixed exchange ratio to 0.216. The members of the Baltic Trading special committee expressed the view that, subject to further due diligence regarding the vessel sale process and appraisals, a sale of the two vessels to Genco was favorable to Baltic Trading. The Baltic Trading special committee determined that the Stock Purchase Agreement should be executed at the same time as the merger agreement and be consummated quickly after execution. At the same meeting, Kaye Scholer provided an update to the Baltic Trading special committee regarding the negotiations of the merger agreement and the voting agreement.

65.     On March 27, 2015, the Baltic Trading special committee held two telephonic meetings. At these meetings, Mr. Wood reported on his discussions with Mr. Dolphin relating to elimination of the condition relating to Genco shareholder approval. The Baltic Trading special committee also requested detailed information regarding the valuation of the vessels to be sold and the efforts to market these vessels. In response to this request, the Baltic Trading special committee received a due diligence report as to Baltic Trading's management's marketing efforts with respect to such vessels, including that this effort had involved brokers and the solicitation of

multiple potential purchasers, which had resulted in multiple inspections of Baltic Trading vessels. The highest indication of interest that resulted from this effort was a preliminary offer of $31 million for one vessel. Kaye Scholer also reported as to the negotiations of the transaction-related agreements and the Baltic Trading special committee provided guidance as to the resolution of the remaining issues. On the same day, the Genco special committee and the Genco board each met telephonically to review the terms of the merger, the vessel sale transaction and related matters. Upon review of such terms, the Genco special committee confirmed its support of the merger and the vessel sale transaction on the terms discussed.

66.    On April 2, 2015, the Genco special committee, together with representatives from Houlihan Lokey and Milbank Tweed, met telephonically to review and approve the merger agreement, the Stock Purchase Agreement, and the transactions contemplated by each of those agreements. At the meeting, representatives of Milbank Tweed reviewed with the members of the Genco special committee the substantially final terms of the draft merger agreement and the draft Stock Purchase Agreement. Representatives of Houlihan Lokey then presented materials and rendered its oral opinion to the Genco special committee, which was later confirmed by delivery of a separate written opinion, dated April 7, 2015, that, as of such date, and subject to the assumptions made, procedures followed, matters and factors considered and limitations and qualifications on the review undertaken set forth in each such opinion, the 0.216 exchange ratio was fair, from a financial point of view, to Genco (the "Houlihan Lokey Fairness Opinion"). The members of the Genco special committee determined that the merger and the exchange of Baltic Trading shares for Genco shares in connection with the merger, the merger agreement, the Stock Purchase Agreement, the voting agreement, and the transactions contemplated by each of the foregoing, including the exchange of Baltic Trading shares for Genco shares in connection with

the merger and the vessel sale transaction pursuant to the Stock Purchase Agreement, are advisable and in the best interests of Genco and its shareholders, and unanimously voted to recommend that the Genco board approve the merger agreement and the other transactions with Baltic Trading as well as the voting agreement and approved of various related matters.

67.     Later on April 2, 2015, the Genco board, together with representatives from Houlihan Lokey, Kramer Levin and Milbank Tweed, met telephonically to consider and approve the merger, the Stock Purchase Agreement and the transactions contemplated thereby. At such meeting, representatives from Milbank Tweed reviewed with the Genco board members the substantially final terms of the draft merger agreement and the draft Stock Purchase Agreement. Representatives from Houlihan Lokey then presented materials and rendered the Houlihan Lokey Fairness Opinion. The Genco board determined that the merger and the exchange of Baltic Trading shares for Genco shares in connection with the merger, the merger agreement, the Stock Purchase Agreement, the voting agreement, and the transactions contemplated by each of the foregoing, including the exchange of Baltic Trading shares for Genco shares in connection with the merger and the vessel sale transaction pursuant to the Stock Purchase Agreement, were advisable and in the best interests of Genco and its shareholders, and unanimously resolved (other than Georgiopoulos, who abstained given his role as a member of the Baltic Trading board) to recommend to Genco shareholders the adoption and approval of the merger agreement and approval of the merger.

68.     The Baltic Trading special committee held a meeting at the offices of Kaye Scholer in New York City on April 2, 2015. Representatives of Blackstone provided a financial review of the merger and indicated that they would be prepared to deliver an opinion as to the fairness of the exchange ratio, from a financial point of view, to the non-Genco Baltic Trading

shareholders. Representatives of PJSC also provided a financial review of the merger and indicated that they would be prepared to deliver an opinion as to the fairness of the exchange ratio, from a financial point of view, to the non-Genco Baltic Trading shareholders. Representatives of Kaye Scholer then reviewed with the Baltic Trading special committee the terms of the merger agreement, the Stock Purchase Agreement and the other transaction documents provided to them prior to the meeting, the fact that the consent of certain of Baltic Trading's lenders was required in order to engage in the vessel sale, and the draft resolutions that the Baltic Trading special committee would consider adopting at a meeting relating to the approval of the merger, the Stock Purchase Agreement, and related matters. The Baltic Trading special committee determined to withhold its approval of the merger, the Stock Purchase Agreement and related matters until there was more certainty as to when the consent of its lenders to the sale of the two vessels would be obtained.

69.     The parties finalized the remaining terms of the merger agreement, the Stock Purchase Agreement and other transaction documents on April 6, 2015.

70.     At a telephonic meeting of the Baltic Trading special committee held on April 7, 2015, the Baltic Trading special committee members were informed as to resolution of the remaining issues under the merger agreement, the Stock Purchase Agreement and the other transaction documents, final drafts of which were provided to the Baltic Trading committee members prior to such meeting, and the fact that the requisite lender consents were obtained. At such meeting, a representative of Blackstone rendered an oral opinion to the Baltic Trading special committee, which was subsequently confirmed by delivery of a written opinion dated April 7, 2015, to the effect that, as of that date and based on and subject to the various assumptions made, procedures followed, factors considered and limitations on the review

undertaken by Blackstone in rendering its opinion, the 0.216 exchange ratio was fair, from a financial point of view, to the non-Genco Baltic Trading shareholders. At such meeting, a representative of PJSC also rendered an oral opinion to the Baltic Trading special committee, which was subsequently confirmed by delivery of a written opinion dated April 7, 2015, to the effect that, as of such date, and based upon and subject to the various assumptions made, procedures followed, matters considered and limitations and qualifications described in the opinion, the 0.216 exchange ratio was fair to the non-Genco Baltic Trading shareholders from a financial point of view. Following discussion at such meeting, the members of the Baltic Trading special committee unanimously voted to recommend that the Baltic Trading board approve the merger agreement and the other transactions with Genco as well as the voting agreement and approved of various related matters. Immediately following the conclusion of the Baltic Trading special committee meeting, a telephonic meeting of the Baltic Trading board was convened to consider the merger and related matters. The members of the Baltic Trading board, by unanimous vote of all directors other than Georgiopoulos (who abstained given his role as a member of the Genco board), approved and declared advisable the merger agreement and the merger, and approved the other transactions with Genco, the voting agreement with Centerbridge and various related matters.

71.　　Later on April 7, 2015, the parties executed the merger agreement and the Stock Purchase Agreement, and the parties and Centerbridge executed the voting agreement.

**D.　　The Proposed Transaction**

72.　　On April 8, 2015, Baltic Trading and Genco issued a press release announcing the Proposed Transaction:

> Genco Shipping & Trading Limited ("Genco") (OTCBB: GSKNF) and its subsidiary Baltic Trading Limited (NYSE: BALT) ("Baltic Trading") today

announced that they have entered into a definitive merger agreement under which Genco will acquire Baltic Trading in a stock-for-stock transaction. Under the terms of the agreement, Baltic Trading will become an indirect wholly-owned subsidiary of Genco, and Baltic Trading shareholders will receive 0.216 shares of Genco common stock for each share of Baltic Trading common stock they own at closing, with fractional shares to be settled in cash. Upon consummation of the transaction, Genco shareholders are expected to own approximately 84.5 percent of the combined company and Baltic Trading shareholders are expected to own approximately 15.5 percent of the combined company. Genco expects to have its stock listed on the NYSE upon consummation of the transaction.

The combined company expects to further extend its leadership position in drybulk shipping and own a combined fleet of 70 drybulk vessels with an average age of 8.8 years and an aggregate carrying capacity of approximately 5,159,000 dwt, consisting of 13 Capesize, eight Panamax, 21 Supramax, four Ultramax, six Handymax and 18 Handysize vessels, after the expected delivery of two Ultramax newbuildings previously contracted by Baltic Trading.

Peter C. Georgiopoulos, Chairman of the Genco and Baltic Trading Boards of Directors said, "This transaction is a natural evolution for Genco and Baltic Trading, and we are confident that it will deliver superior value to the shareholders of both companies. The combined company will be poised to capitalize on opportunities in the current market environment, and we believe the combined platform is well positioned for continued growth as a consolidator in our industry. We look forward to completing this transaction, which has been approved by both companies' independent special committees, and building on our position as a leader in international drybulk shipping to create value for our shareholders."

John C. Wobensmith, President of Genco and President and Chief Financial Officer of Baltic Trading, said, "By combining Genco and Baltic Trading we are creating an industry leader that is well positioned for future growth and expansion, and we are excited about our future prospects. Through this combination, we expect to benefit from having a larger platform and solid financial position for value creation. The transaction will simplify our ownership structure, enhance the combined company's scale and operations and reduce overhead. We appreciate the continued support of our commercial banks and look forward to continuing to provide our charterers around the world with best-in-class shipping services."

In addition to other customary closing conditions, the closing of the transaction is subject to the listing of Genco common stock on the NYSE, the affirmative vote of the holders of a majority of the shares of Genco common stock present and voting at a meeting of Genco shareholders called to consider the transaction, the affirmative vote of the holders of a majority of the outstanding shares of Baltic Trading common stock and Class B stock, voting together as a single class, at a

meeting of Baltic Trading shareholders called to consider the transaction and the affirmative vote of the holders of a majority of the outstanding shares of Baltic Trading common stock and Class B stock (excluding shares held by Genco, its subsidiaries, and directors and officers of Baltic Trading who are also directors or officers of Genco) at such Baltic Trading shareholders' meeting. Certain affiliates of Centerbridge Partners, L.P., as shareholders of Genco and/or Baltic Trading, as the case may be, have entered into a voting and support agreement, pursuant to which such shareholders have agreed to vote their shares in favor of the transaction.

The transaction is expected to close in the third quarter of 2015.

The Boards of Directors of both Genco and Baltic Trading established independent special committees to review the transaction and negotiate the terms on behalf of their respective companies. Both independent special committees unanimously approved the transaction. The Boards of Directors of both companies approved the merger by unanimous vote of directors present and voting, with Peter C. Georgiopoulos, Chairman of the Board of each company, recused for the vote.

Genco also announced that certain of its wholly-owned subsidiaries have entered into a loan agreement providing for a new $60 million revolving credit facility with ABN AMRO Capital USA LLC and certain other lenders, with an uncommitted accordion feature that, if exercised, will upsize the facility up to $150 million in total.

In addition, Genco announced today that it has entered into an agreement to acquire all of the shares of two single-purpose entities that are wholly owned by Baltic Trading, each of which owns one Capesize drybulk vessel, for an aggregate purchase price of $68.5 million, subject to reduction for approximately $41 million of outstanding first-mortgage debt of such single-purpose entities that is to be guaranteed by Genco and an adjustment for the difference between such single-purpose entities' current assets and total liabilities as of the closing date. Baltic Trading had previously determined to divest these vessels to increase its liquidity position and strengthen its balance sheet. Through the transactions, Genco is acquiring the vessels known as the Baltic Lion and the Baltic Tiger, which will continue operating under their current time charters. The acquisition of the two vessel-owning entities is subject to the completion of customary documentation and closing conditions. The independent special committees of both companies' Boards of Directors reviewed and approved this transaction, which is expected to close on April 8, 2015.

Houlihan Lokey Capital, Inc. acted as financial advisor to Genco and Genco's independent special committee, and Milbank, Tweed, Hadley & McCloy LLP acted as legal advisor to Genco's independent special committee. Blackstone Advisory Partners LP served as financial advisor and Kaye Scholer LLP served as

legal advisor to Baltic Trading's independent special committee. Evercore Partners Inc. is serving as an advisor to Baltic Trading. Kramer Levin Naftalis & Frankel LLP serves as regular corporate counsel to Genco and Baltic Trading.

### E.     The Unfair Price

73.     The Company's stockholders will receive 0.216 of a share of Genco for each common share of Baltic Trading. Based on Genco's closing price of $7.00 on April 7, 2015, the last trading day prior to the announcement of the Proposed Transaction, Baltic Trading stockholders stand to receive compensation valued at $1.51 per share, representing a negative 6.7% premium relative to the $1.62 closing price of Baltic Trading shares on April 7, 2015.

74.     Genco shares closed at $6.85 on May 7, 2015, representing a negative 8.7% premium relative to the consideration offered by the Proposed Transaction.

75.     Baltic Trading shares have recently underperformed those of the Company's peers. Below is a chart depicting the relative growth of 10,000 shares of Baltic Trading versus 10,000 shares of other shipping equities purchased in 2010.



**Growth of 10,000** BALT

● BALT      ● Shipping & Ports      ● S&P 500 TR USD

| History (04/30/2015) | 2010 | 2011 | 2012 | 2013 | 2014 | YTD |
|---|---|---|---|---|---|---|
| BALT | — | -49.07 | -32.21 | 117.79 | -60.09 | -43.43 |
| Shipping & Ports | — | -18.16 | -13.02 | 14.85 | -18.54 | 0.67 |
| S&P 500 TR USD | — | 2.11 | 16.00 | 32.39 | 13.69 | 1.92 |
| +/- Shipping & Ports | — | -30.91 | -19.19 | 102.94 | -41.55 | -44.10 |
| +/- S&P 500 TR USD | — | -51.18 | -48.21 | 85.40 | -73.78 | -45.35 |
| Dividend Yield % | 3.13 | 9.47 | 8.05 | 0.78 | 2.39 | 2.11 |
| Market Cap USD Mil | — | 108 | 69 | 370 | 147 | 83 |

76.     Wall Street analysts have set price targets for Baltic Trading that considerably exceed the consideration offered by the Proposed Transaction. On April 8, 2015, analysts at MLV & Co. reiterated their "buy" rating for Baltic Trading with a $4.00 price target. On April

27, 2015, Jefferies Group set a price target of $3.00 for Baltic Trading, maintaining a "buy" rating for the Company. According to an April 8, 2015 *DakotaFinancialNews.com* article entitled "MLV & Co. Reaffirms "Buy" Rating for Baltic Trading (BALT)," Baltic Trading has an average analyst rating of "buy" and an average price target of $3.83.

77.     Even after the announcement of the Proposed Transaction, the Company continues to be considerably undervalued according to its price-book ratio. According to *Morningstar.com*, Baltic Trading has a price-book ratio of 0.3 compared to an industry average of 1.2 as of May 11, 2015.

78.     The consideration offered by the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of the Company's common shares is materially in excess of the amount offered in the Proposed Transaction. In short, the Proposed Transaction undervalues Baltic Trading. It is significant that Baltic Trading's price-book ratio is so far below 1.0. The Company should be able to sell its assets for considerably more than the consideration offered by the Proposed Transaction.

79.     Furthermore, negotiations over the price and terms of the Proposed Transaction were hardly conducted at arm's length. As discussed below, the boards and executive leadership of the acquiror and acquiree overlap considerably. Also, Genco has voting control over Baltic Trading as a result of the 6,356,471 shares of Baltic Trading Class B Stock that Genco indirectly holds through a subsidiary, which represents in the aggregate 64.6% of the voting power of Baltic Trading's outstanding capital stock. During the negotiation of the Proposed Transaction, Baltic Trading was informed by Genco that Genco would not be supportive of a change of control transaction between Baltic Trading and a third party.

80.     Baltic Trading is poised to capitalize on its expanding fleet in 2015. According to a March 2, 2014 Baltic press release announcing the Company's financial results for the fourth quarter of 2014 and the 2014 fiscal year, an agreement to purchase up to four new Ultramax newbuilding drybulk vessels exists. Three of the four purchased vessels are scheduled to be delivered in 2015. In the same press release, the Company announced that it had entered into a $148 million credit facility with Nordea Bank to refinance the Company's existing senior secured revolving credit facility.

81.     In sum, Genco is seeking to acquire the Company at the most opportune time, at a time when the Company is underperforming, but is positioned for tremendous growth in the Company's stock price.

82.     As these indicators make clear, Baltic Trading, if properly exposed to the market for corporate control, would bring a price materially in excess of the amount offered in the Proposed Transaction.

**F.     Conflicts of Interest**

83.     A conflict of interest in approving the Proposed Transaction exists because the majority of Baltic Trading's Board overlaps with Genco's board and/or management. Three members of the Company's five-member Board (Georgiopoulos, Perrin, and Mavroleon) are or recently were members of Genco's Board. Georgiopoulos continues to serve as the Chairman of both companies. Mavroleon on the Genco board from July 27, 2005 until July 9, 2014, and Perrin served on the Genco board from August 15, 2005 until July 9, 2014. In addition, Baltic Trading President, Chief Financial Officer, Secretary and Treasurer Wobensmith is Genco's President and Chief Financial Officer, and he is also on Genco's board of directors.

84.     Furthermore, Baltic Trading director Basil Mavroleon will be appointed to the

Genco board subject to approval of a board size increase amendment.

**G.**     **The Flawed Majority of the Minority Shareholder Vote**

85.     Because Genco, which has voting control over Baltic Trading, stands on both sides of the Proposed Transaction, Defendants bear the burden of proving the entire fairness of the Proposed Transaction, including all aspects of its negotiation, structure, price, and process.

86.     The Proposed Transaction is subject to, among other things, the approval by holders of a majority of the shares held by Baltic Trading stockholders (excluding shares held by Genco, its subsidiaries, and directors and officers of Baltic Trading who are also directors and officers of Genco). However, some of the largest shareholders of the Company are also some of the largest shareholders of Genco. According to the Registration Statement, Centerbridge Partners, L.P. owns or controls approximately 13.87% of the Company's outstanding shares and Apollo Global Management, LLC owns or controls approximately 9.89% of the Company's outstanding shares such that together they own or control approximately 23.76% of the Company's outstanding shares. At the same time, these entities are the two largest holders of Genco shares and have seats on Genco's board of directors, so these holders will vote in favor of the Proposed Transaction. Thus, that the number of votes needed to satisfy the majority of the minority condition will be obtained is essentially a foregone conclusion.

87.     Had the Board sought a true majority of the minority provision, it would not have included the over 23% of shares held by these two significant shareholders of Genco.

**H.**     **Related-Party Transactions**

88.     In a Form 8-K filed with the SEC on April 8, 2015, the Company announced that Baltic had entered into a Stock Purchase Agreement and sold all of its equity interests in Baltic Lion Limited and Baltic Tiger Limited to Genco for an aggregate purchase price of $68.5. The

two entities respectively own Baltic Trading's Capesize drybulk vessels, known as Baltic Lion and Baltic Tiger. The $68.5 million purchase price is subject to an approximate $41 million reduction for an outstanding first-mortgage debt, leaving the total purchase price at only $27.5 million. This figure is considerably below the $103 million that Baltic originally paid for the two vessels less than two years ago in October 2013.

89.     Peter Georgiopoulos has criticized the related-party transactions of other shipping companies in the past. An April 30, 2014 *Fool.com* article about related-party transactions orchestrated by the CEO of Dryships Inc. entitled "How to Get Filthy Rich From DryShips Inc." noted as follows:

> The self-dealing has been going back and criticized by others for many years. Back in 2007, Peter Georgiopoulos, CEO of Genco Shipping & Trading, referred to DryShips as "the guys who play games with their shareholders' money."

## I.     Insider Benefits

90.     Rather than negotiate a transaction that was in the best interests of Baltic Trading's common shareholders, the Company's executive officers and directors are acting to better their own personal interests through the Proposed Transaction.

91.     At the effective time of the Proposed Transaction, each share of Baltic Trading restricted stock outstanding immediately prior to the effective time of the merger will immediately vest and be automatically converted into the right to receive 0.216 shares of Genco common stock. The table below sets forth the vesting of restricted stock that the named executives would receive under the following sets of circumstances: change of control, termination without cause, and death or disability. In each set of circumstances, Genco has assumed a triggering event as of the end of the day on December 31, 2014 and used the closing market price of Genco's common stock on December 31, 2014 of $13.50 per share and the

closing market price of Baltic Trading's common stock on December 31, 2014 of $2.51 per share

for purposes of the calculations for the table below:

| Name | Value of Restricted Stock Subject to Accelerated Vesting ($) | | |
|---|---|---|---|
| | Change of Control | Termination without Cause(1) | Death or Disability |
| John C. Wobensmith | | | |
| Genco | $ 2,998,620 | $ 2,998,620 | $ 333,180 |
| Baltic Trading | $ 1,751,770 | $ 1,751,770 | $ 26,582 |
| Total | $ 4,750,390 | $ 4,750,390 | $ 109,877 |
| Peter C. Georgiopoulos | | | |
| Genco | $ 11,244,825 | $ 11,244,825 | $ 11,244,825 |
| Baltic Trading | $ 3,049,279 | $ 3,031,033 | $ 3,049,279 |
| Total | $ 14,294,104 | $ 14,275,858 | $ 14,294,104 |
| Apostolos D. Zafolias | $ 256,379 | $ — | $ 28,485 |
| Joseph Adamo | $ 77,814 | $ — | $ 8,640 |

(1)     Includes termination by Wobensmith for good reason.

92.     In addition, Baltic Trading President and Chief Financial Officer John Wobensmith stands to benefit from a generous employment agreement in the event that he is terminated from his role as President of Genco. The table below sets forth the payments and other benefits that would be provided to Wobensmith upon termination of his employment by Genco without cause or by him for good reason under the following sets of circumstances as described more fully above: change of control, no change of control, and death or disability. In each set of circumstances, Genco has assumed a termination as of the end of the day on December 31, 2014 and used the closing market price of Genco's common stock on December 31, 2014 of $13.50 per share for purposes of the calculations for the table below:

| Termination by Executive for Good Reason or by Genco without Cause | | |
|---|---|---|
| Change of | No Change | Death or |

| | Control(1) | of Control | Disability |
|---|---|---|---|
| Cash Severance Payment | $      13,378,122 | $ 3,850,000 | $500,000 |
| Estimated Present Value of Continued Benefits Following Termination | | | |
| (2) | $          172,000 | $   105,295 | $  53,470 |

(1) Includes the funding of the excise tax under Section 280G of the Code as described above on severance payments made and on the value of restricted stock subject to accelerated vesting.

(2) Wobensmith and his dependents are entitled to medical, dental and certain other insurance coverage substantially identical to the coverage in place prior to termination. This benefit period is two years if Genco terminates Wobensmith's employment without cause or if he terminates his employment at Genco or Baltic Trading, as applicable, with good reason, three years if such a termination occurs within two years following a change in control, or twelve months in the event of his death or disability. The amounts presented for termination for good reason or without cause assume a discount rate of 6% per annum and annual cost increases of 5% for health insurance. The amounts presented for death or disability assume circumstances which would provide the maximum benefit (i.e., disability of the executive).

## J.   The Preclusive Deal Protection Devices

93.     The Proposed Transaction is also unfair because, as part of the Merger Agreement, the Individual Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

94.     The Merger Agreement contains a "no-shop" provision. Pursuant to Section 6.6(a) of the Merger Agreement, Baltic Trading and its subsidiaries must immediately cease and cause to be terminated any existing discussions or negotiations with any person or its representatives with respect to any acquisition proposal. Specifically, Section 6.6(a) provides that:

> The Company agrees that neither it nor any of its Subsidiaries nor any of the officers and directors of it or its Subsidiaries shall, and that it shall cause its and its Subsidiaries' Representatives not to, directly or indirectly, (i) initiate, solicit, knowingly encourage or facilitate any inquiries or the making of any proposal or offer with respect to, or a transaction to effect, a merger, reorganization, share exchange, consolidation, business combination, recapitalization, liquidation, dissolution or similar transaction involving the Company or any of its Significant Subsidiaries or any purchase or sale of 20% or more of the consolidated assets (including shares or other ownership interests of its Subsidiaries) of the Company and its Subsidiaries, taken as a whole, or any purchase or sale of, or tender or exchange offer for, the Company's voting securities that, if consummated, would result in any Person (or the shareholders or other equity interest holders of such Person) beneficially owning securities representing 20% or more of the Company's total voting power (or of the surviving parent entity in such transaction) or the voting power of any of its Significant Subsidiaries, but

excluding in each case any Company Vessel Sale (any such proposal, offer or transaction (other than a proposal or offer made by a Party to this Agreement) being hereinafter referred to as an "Acquisition Proposal"), (ii) participate in any discussions with or provide any confidential information or data to any Person relating to an Acquisition Proposal, or engage in any negotiations concerning an Acquisition Proposal, or knowingly facilitate any effort or attempt to make or implement an Acquisition Proposal, (iii) approve or execute or enter into any letter of intent, agreement in principle, merger agreement, asset purchase or share exchange agreement, option agreement or other similar agreement related to any Acquisition Proposal or (iv) propose or agree to do any of the foregoing.

95.     In addition, the Merger Agreement contains a "matching rights" provision that serves as a deterrent to any alternative acquisition proposals. Pursuant to Section 6.6(b)(iv) of the Merger Agreement, the Company may not revise or withdraw the Board's recommendation of the Proposed Transaction or terminate the Merger Agreement for a superior proposal without first providing Genco with advance notice of the same, including a copy of the proposal and the material terms and conditions of such proposal, as well as three business days to renegotiate the terms of its own proposal. Further, any amendment to the financial terms or other material terms of the alternative proposal requires a new period of three business days before an adverse recommendation change is made. Specifically, Section 6.6(b)(iv) provides, in relevant part, that:

> Notwithstanding anything in this Agreement to the contrary, with respect to an Acquisition Proposal, the Company Board (acting through the Company Special Committee, if then in existence) may make a Change in Company Recommendation if and only if (A) an unsolicited bona fide written Acquisition Proposal (that did not result from a breach of this Section 6.6) is made to the Company by a third party, and such Acquisition Proposal is not withdrawn, (B) the Company Board has concluded in good faith (acting through the Company Special Committee, if then in existence, and after consultation with its outside legal counsel and financial advisors) that such Acquisition Proposal constitutes a Superior Proposal, (C) the Company Board has concluded in good faith (acting through the Company Special Committee, if then in existence, and after consultation with its outside legal counsel) that failure to do so would be inconsistent with its duties under applicable Law, (D) three Business Days shall have elapsed since the Company has given written notice to Parent advising Parent that the Company Board intends to take such action, which notice shall specify in reasonable detail the reasons therefor, including the material terms and conditions of any such Superior Proposal that is the basis of the proposed action,

and shall include a copy of such Superior Proposal, a copy of the relevant proposed transaction agreements, if any, and a copy of any written financing commitments relating thereto and a written summary of the material terms of any Superior Proposal not made in writing, including with respect to any financing commitments relating thereto (a "Notice of Recommendation Change") (it being understood that any amendment to any material term of such Superior Proposal shall require a new Notice of Recommendation Change and a new three-Business Day period), (E) during such three-Business Day period, the Company has considered and, at the reasonable request of Parent, engaged in good faith discussions with Parent regarding, any adjustment or modification of the terms of this Agreement proposed by Parent and (F) the Company Board, following such three-Business Day period, again determines in good faith (acting through the Company Special Committee, if then in existence, and after consultation with its outside legal counsel and financial advisors, and taking into account any adjustment or modification of the terms of this Agreement proposed by Parent) that such Acquisition Proposal constitutes a Superior Proposal.

96.     Moreover, the Merger Agreement contains an additional "information rights" provision. Pursuant to Section 6.6(b)(ii) of the Merger Agreement, promptly after the receipt by Baltic Trading of any request for information or other inquiry that Baltic Trading reasonably believes could lead to any proposal or other transaction, Baltic Trading must provide Genco with the material terms and conditions of any such request or inquiry, the identity of the person making any such request or inquiry, and copies of any written offer, proposal or request, or inquiry. Specifically, Section 6.6(b)(ii) provides that:

> The Company shall notify Parent promptly (but in no event later than 36 hours) after receipt of any Acquisition Proposal, or any request for nonpublic information relating to the Company or any of its Subsidiaries by any Person that informs the Company or any of its Subsidiaries that it is considering making, or has made, an Acquisition Proposal, or any inquiry from any Person seeking to have discussions or negotiations with the Company relating to a possible Acquisition Proposal. Such notice shall be made orally and confirmed in writing, and shall indicate the identity of the Person making the Acquisition Proposal, inquiry or request and the material terms and conditions of any inquiries, proposals or offers (including a copy thereof if in writing and any related documentation or correspondence). The Company shall also promptly, and in any event within 36 hours, notify Parent, orally and in writing, if it enters into discussions or negotiations concerning any Acquisition Proposal or provides nonpublic information or data to any Person in accordance with this Section 6.6(b) and keep Parent informed of the status and material terms of any such

> proposals, offers, discussions or negotiations on a current basis, including by
> providing a copy of all written material documentation or correspondence relating
> thereto.

Thus, Genco can easily match any competing offer because it is granted unfettered access to the

offer, in its entirety, and has significant matching rights that eliminate any leverage that the

Company has in receiving a competing offer.

97.     Finally, Genco and Baltic Trading have entered into voting agreement with

certain affiliates of Centerbridge Partners, L.P. ("Centerbridge"), as shareholders of Baltic

Trading to vote in favor of the Proposed Transaction. As of the filing of the Registration

Statement, the stockholders signing the Baltic Trading voting agreements beneficially owned an

aggregate of approximately 13.87% of the outstanding Baltic Trading common stock.

Additionally, Genco has agreed to vote, and to cause each of its controlled affiliates to vote, all

shares of Baltic Trading common stock and Baltic Trading Class B Stock owned by it or any

such affiliate in favor of the merger.

98.     Section 8 provides that under specified circumstances, including if Baltic Trading

terminates the Merger Agreement to approve or recommend a superior proposal, Baltic Trading

must pay Genco a termination fee in connection with the Merger Agreement equal to $3,250,000

if the Proposed Transaction is terminated under certain circumstances, which all but ensures that

no competing offer will be forthcoming.

99.     This "termination fee" provision, coupled with the "no-shop" provision,

"matching rights" provision, "information rights" provision, and voting agreements all but

ensures that no competing offer will be forthcoming.

100.    Ultimately, these preclusive deal protection provisions improperly restrain the

Company's ability to solicit or engage in negotiations with any third party regarding a proposal

to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative transaction that constitutes or would reasonably constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

### K.    The Materially Incomplete and Misleading Registration Statement

101.    On May 4, 2015, Genco filed the Registration Statement with the SEC in connection with the Proposed Transaction in order to solicit the Company's shareholder's votes in support of the Proposed Transaction. However, the Registration Statement fails to disclose material information to the stockholders of the Company so that the stockholders may make an informed decision regarding the Proposed Transaction.

***Omissions Concerning the Background of the Proposed Transaction***

102.    Specifically, the Registration Statement fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the Registration Statement fails to disclose the following information:

a.    All details relating to the sale of Baltic Lion and Baltic Tiger to Genco, including all details relating to valuation of the vessels and all details relating to the sale process;

b.    All details relating to the possession of any knowledge by Georgiopoulos of the Baltic Lion and Baltic Tiger sale process along with all details relating to any involvement of Georgiopoulos in the sale process;

c.    All details relating to the discussion leading up to and the rationale for the conclusion at the November 19, 2014 meeting that "there would be no conflict of interests if Mavroleon and Perrin served as members of the Baltic Trading special

committee" in spite of the fact that Mavroleon and Perrin were previously Genco directors;

d.  All details relating to the questioning during the November 24, 2014 meeting about any conflicts they might have in considering the Genco proposal, the Company A and Company B inquiries, and other strategic alternatives available to Baltic Trading along with all details relating to the answers provided in response to the questions and the determination that no material conflicts existed;

e.  All details relating to the discussion during the November 28, 2014 meeting regarding the "ability of Baltic Trading to pursue a transaction with a party other than Genco in light of Genco's voting control of, and other contractual relationships with, Baltic Trading";

f.  All details relating to the discussion during the November 24, 2014 meeting regarding "whether the Management Agreement might be terminable as a result of Genco's recent bankruptcy and other events, and whether Genco's share ownership position could be diluted to less than 10% of Baltic Trading's outstanding capital stock, which would cause the Class B Stock having 15 votes per share to convert to Baltic Trading common stock having one vote per share";

g.  All details relating to the discussion during the board meetings occurring between December 12, 2014 and December 18, 2014 regarding "the current liquidity issues facing Baltic Trading and various options that could be pursued to address those issues, including an equity offering, debt issuance and the sale of vessels";

h.  All details relating to the special committee's conclusion at the December 19, 2014 meeting that "Baltic Trading's stock currently traded at a significant

discount to NAV, and . . . that an equity issuance would likely be at a discount to Baltic Trading's stock price";

i. All details relating to the presentation made by Blackstone at the December 31, 2014 meeting regarding the strategic alternatives available to Baltic Trading in lights of its then-current and forecasted liquidity situation and need for financing;

j. All details relating to the analysis and discussion leading up the special committee's conclusion at the January 6, 2015 meeting "that the sale of one or more vessels was in the best interests of Baltic Trading, and that Baltic Trading's management should commence a process to explore a vessel sale";

k. All details relating to the discussion during the January 7, 2015 meeting regarding the "feasibility of diluting Genco below 10% share ownership";

l. The rationale the view of the Baltic Trading board members during the January 7, 2015 meeting that "it was not practicable to dilute Genco below 10% share ownership";

m. All details relating to the "counterproposal regarding the methodology for determining NAV" sent by representatives of Blackstone on behalf of the Baltic Trading special committee to representatives of Houlihan Lokey on January 7, 2015;

n. All details relating to the "presentation from Blackstone on valuation scenarios" at the January 16, 2015 special committee meeting;

o. All details relating to the "presentation by Blackstone regarding the potential liquidation value of Baltic Trading" during the January 19, 2015 special committee meeting;

p. All details relating to the special committee's consideration of "the current status of efforts of Baltic Trading's management to sell two vessels and the liquidity issues faced by Baltic Trading" at the special committee meetings held in late February;

q. All details relating to how many and what types of potential buyers were contacted regarding the sale of the two vessels, Baltic Lion and Baltic Tiger;

r. All details relating to the discussion during the March 19, 2015 special committee meeting regarding "the vessel sales and the related marketing efforts and valuations";

s. All details relating to "aggregate appraised value provided by an independent valuation firm of the two vessels" and the valuation itself since Dolphin, on behalf of the Genco special committee, had communicated to Wood on March 23, 2015 that Genco was willing to purchase two vessels from Baltic Trading for this value;

t. All details relating to the Genco's "reevaluating [of] the proposed exchange ratio in light of the vessel sales and the continued deterioration of vessel values in the vessel marketplace" as of March 23, 2015;

u. All details relating to the preliminary offer of $31 million for one vessel, including which vessel the offer pertained to and any valuation attached the vessel by valuation experts;

v. All details relating to the fairness opinion delivered by Blackstone on April 7, 2015; and

w. All details relating to the fairness opinion delivered by PJSC on April 7, 2015.

***Omissions Concerning Management Projections***

103.    The Registration Statement also fails to disclose key information regarding certain projections prepared by Genco and Baltic management and provided to, and relied upon, by Blackstone and PCSL, Baltic's financial advisors. Specifically, the Proxy Statement/Prospectus fails to disclose:

   a.  The details included in the  "certain internal information concerning the business, financial condition, and operations of Baltic Trading and Genco" prepared and furnished to Blackstone and PJSC by the management of Baltic Trading and Genco, . . ." as well as the "certain internal financial analyses, estimates and forecasts relating to Baltic Trading and Genco, prepared and furnished to Blackstone and PJSC by the management of Baltic Trading and Genco, respectively, which related solely to certain projected expenses under the Management Agreement and Genco's agency agreement with MEP (the "Expense Analyses")";

   b.  The most recently available appraisals prepared by three third-party appraisal firms (VesselsValue.com ("VesselsValue"), Marsoft, Inc. ("Marsoft") and Clarkson Valuations Limited ("Clarksons")) with regard to the fleets owned by Baltic Trading and Genco (collectively, the "Third Party Appraisals") used by Blackstone and PJSC in their analyses;

   c.  Information related to discussions between Blackstone and the senior managements of Genco and Baltic concerning their evaluations of the merger and their respective businesses, operating and regulatory environments, financial condition, prospects, and strategic objectives, as well as such other matters as Blackstone deemed necessary or appropriate for purposes of rendering its opinion;

    d.  The "certain internal financial statements and other financial and operating data concerning Baltic Trading and Genco prepared and provided to PJSC by the management of Baltic Trading and Genco, respectively";

    e.  The "forward-looking information for Baltic Trading and Genco, including estimates of certain potential benefits of the proposed business combination, prepared by the management of Baltic Trading and Genco, respectively, in each case, as approved for PJSC's use by Baltic Trading"; and

    f.  Information related to discussions between PJSC and the senior managements of Genco and Baltic regarding the past and current operations, financial condition and prospects of Baltic Trading and Genco.

***Omissions Concerning Blackstone's Financial Analysis of Genco and Baltic***

104.    The Registration Statement also fails to disclose the underlying methodologies, key inputs, and multiples relied upon and observed by Blackstone in evaluating Genco and Baltic for the Proposed Transaction. Specifically, the Registration Statement fails to disclose:

    a.  In connection with the *Net Asset Value Analyses,* (i) the methodology used by VesselsValue, Marsoft and Clarksons in determining the Baltic fleet values at $211 million, $239 million, and $299 million respectively and in determining the Genco fleet values at $703 million, $841 million, and $778 million respectively, (ii) the methodologies for determining Cash and Cash Equivalents, Networking Capital, New Build Estimated Value, Total Indebtedness, Newbuild Estimated Capital Expenditures for Baltic and Gencorp as well as Investment in Jinhui, Investment in Baltic Trading, Baltic Trading Management Agreement, MEP Management Agreement, and Other Fixed Assets for Genco; and (iii) the

methodology for translating the calculated Net Asset Values into per share net asset values of $1.66, $2.13, and $2.04, respectively, for Baltic and $9.04, $11.32, and $10.29, respectively for Genco;

b. In connection with the *Market Capitalization Analysis*, (i) the observed closing share prices for Baltic and Genco common stock and (ii) the specific calculation used in determining the implied exchange ratios; and

c. In connection with the *Selected Companies Analysis*, (i) the objective selection criteria and metrics; (ii) the specific Wall Street equity analyst whose research was used for this analysis; (iii) the specific methodologies employed by the Wall Street equity research analysts in developing their historical and estimated financial data; (iv) the methodologies used by VesselsValue, Marsoft and Clarksons in developing their vessel and fleet appraisals; (v) the observed company-by-company financial values, multiples and ratios; (vi) the methodologies for determining the Total Enterprise Value (TEV) and estimated Operating Asset Value (OAV); the methodologies for determining the Low, Medium, and High TEV/OAV multiples of 0.97x, 1.07x and 1.16x respectively; (vii) the methodology for determining the Baltic implied equity values of $89 million, $116 million, and $139 million, respectively, and the Genco implied equity values of $533 million, $607 million, and $673 million, respectively, from the Low, Medium and High TEV/OAV multiples; and (viii) the methodology for determining the Implied Exchange Ratios.

### Omissions Concerning PJSC's Financial Analysis of Baltic Trading

105. The Registration Statement also fails to disclose the underlying methodologies,

key inputs, and multiples relied upon and observed by PJSC in evaluating Genco and Baltic for the Proposed Transaction. Specifically, the Registration Statement fails to disclose:

    a. In connection with the *Historical Stock Trading*, (i) the source of the historical stock price data, (ii) the observed values, and (iii) the methodology for determining the implied exchange ratios of 0.1250–0.2852;

    b. In connection with the *Equity Research Analyst Price Targets*, (i) the names of the seven Wall Street research analysts publishing the price targets used by PJSC (ii) the specific Baltic price targets for each research analyst and FactSet; (iii) the methodologies employed by each research analyst in determining the price target; (iv) the specific Wall Street research analyst used by PJSC for the Genco price target; (v) the methodologies employed by the research analyst in determining the price target; and (vi) the methodology for determining the implied exchange ratios of 0.1000–0.2667;

    c. In connection with the *Net Asset Values Based on Vessel Appraisals,* (i) the methodology for calculating the per share Net Asset Value (NAV) ranges for Baltic and Genco of $2.14–2.17 and $11.62–12.06, respectively and (ii) the methodology for translating the per share NAV ranges into the implied exchange ratio range of 0.1803–0.1839;

    d. In connection with the *Selected Publicly Traded Company Analysis*, (i) the objective selection criteria and metrics; (ii) the specific methodologies employed by ThompsonOne and Jefferies Group LLC in developing their historical and estimated financial data; (iii) the observed company-by-company financial values, multiples and ratios; (iv) the methodologies for determining the Enterprise Value

(EV), Last 12-month (LTM) EBITDA, 2015 EBITDA, 2016 EBITDA, LTM Cash Flow, 2015E Cash Flow, 2016E Cash Flow and NAV; (v) the methodologies for determining the reference range of multiples of EV as a multiple of LTM EBITDA, 2015 EBITDA, 2016 EBITDA, LTM Cash Flow, 2015E Cash Flow, 2016E Cash Flow and NAV, respectively; (vi) the specific methodology for translating the reference range multiples into the ranges of implied values per share for Baltic and Genco for LTM EBITDA, 2015 EBITDA, 2016 EBITDA, LTM Cash Flow, 2015E Cash Flow, 2016E Cash Flow and NAV, respectively; (vii) the methodology for determining the earnings-based implied valuation range for shares of Baltic common stock of $0.00–$1.74 per share and an NAV-based implied valuation range for shares of Baltic common stock of $1.28–$2.40 per share; and (viii) the specific methodology for determining the earnings-based implied valuation range for shares of Baltic Trading common stock from $0.00 to $1.74 per share and an NAV-based implied valuation range for shares of Baltic Trading common stock of $1.28 to $2.40 per share;

e. In connection with the *Contribution Analysis*, (i) the specific EBITDA, NAV and Cash Flow values used in the analysis and (ii) the specific rationale and methodology used to arrive at the implied exchange ratios of 0.1394–0.2291;

f. In connection with the *Selected Precedent Transactions*, (i) the objective selection criteria and metrics; (ii) the observed company-by-company financial values, multiples and ratios; (iii) the specific methodologies employed by the Wall Street research analysts and Thompson One in developing their historical and estimated financial data; (iv) the specific methodology and inputs for determining the LTM

EBITDA, 2015E EBITDA, 2016E EMITDA, LTM Cash Flow, and NAV values;
(v) the methodologies that PJSC used to determine the Reference Range
Multiples, Implied Enterprise Value Multiple ranges, Implied Equity Value
multiple ranges, and Implied Per Share Value multiple ranges for LTM EBITDA,
2015E EBITDA, 2016E EMITDA, LTM Cash Flow, and NAV values,
respectively; and (vi) the methodology for determining the earnings-based
implied valuation range for shares of Baltic Trading common stock of $0.00–
$0.27 per share and the NAV-based implied valuation range for shares of Baltic
Trading common stock of $1.94–$2.16 per share;

g. In connection with the *Implied Premiums Analysis*, (i) the source and
methodology for determining the implied offer premiums of 25.3% over the
closing stock price ratio on the Undisturbed Date (April 1, 2015), of 31.7% over
the 10 trading day average stock price ratio as of the Undisturbed Date, of 37.7%
over the 20 trading day average stock price ratio as of the Undisturbed Date, of
38.2% over the 60 trading day average stock price ratio as of the Undisturbed
Date, of 18.5% over the 120 trading day average stock price ratio as of the
Undisturbed Date, and of 5.6% over the average stock price ratio from July 16,
2014 through the Undisturbed Date and (ii) the conclusion and relevance of the
analysis;

h. In connection with the *Control Premium Analysis*, (i) the methodology and
rationale for selecting a 34% control premium and (ii) the methodology for
determining the range of earnings-based implied values per share for shares of
Baltic Trading common stock of $0.00–$2.33 per share and a range of NAV-

based implied values per share for shares of Baltic Trading common stock of $1.71–$3.21 per share; and

    i.  In connection with the *Premiums Paid Analysis*, (i) the sources of the transaction information and (ii) the observed company-by-company financial values, multiples and ratios.

### Omissions Concerning Houlihan Lokey's Financial Analysis of Genco and Baltic

106.    The Registration Statement also fails to disclose the underlying methodologies, key inputs, and multiples relied upon and observed by Houlihan Lokey in evaluating Genco and Baltic for the Proposed Transaction. Specifically, the Registration Statement fails to disclose:

    a.  In connection with the *Net Asset Value Analyses,* (i) the identity of Appraiser B; (ii) the methodology used by Clarksons and Appraiser B in determining the Genco fleet gross fleet values at $778.3 million and $793.8 million respectively and in determining the Baltic fleet values at $278.3 million and $289.0 million respectively, (iii) the methodologies for determining Cash and Cash Equivalents, Networking Capital, Newbuild Estimated Capital Expenditures, Investment in Baltic Trading, Investment in Jinhui, Baltic Management Agreement, MEP Management Agreement, Other Adjustments, and Outstanding Debt for Gencorp and Baltic; (iv) the methodology and calculations for translating the calculated Net Asset Value estimates into the NAV ranges of $619.2 million–$664.7 million and $118 million–$146.6 million for Genco and Baltic directly; and (v) the methodology and calculations for translating the calculated Net Asset Values ranges into the Asset-Based Approach Average Appraisals Implied Ratio Reference Range of 0.200x–0.231x and into the Asset-Based Approach Low/High

Appraisals Implied Exchange Ratio Reference Range of 0.205x–0.229x;

b. In connection with the *Selected Companies Analysis*, (i) the objective selection criteria and metrics; (ii) the specific sources of the historical and estimated financial data used in the analysis; (iii) the observed company-by-company financial values, multiples and ratios; (iv) definition of "P" used in the P/NAV ratio; (v) the methodologies for determining the individual NAV values, the P values, as well as the P/NAV multiples; (vi) the methodology for determining the Low, High, Median and Mean Average Asset Multiples P/NAV of 0.25x, 0.79x, 0.59x, and 0.55x, respectively; (vii) the rationale and specific parameters for excluding Paragon Shipping Inc. and Jinhui from the revised Asset Value Multiples P/NAV table; (viii) the methodology for determining the P/NAV implied   reference range of 0.75x–0.80x; and (ix) the methodology for determining the Implied Exchange Ratio Reference Range of 0.211x–0.224x;

c. In connection with the *Selected Transactions Analysis*, (i) the objective selection criteria and metrics; (ii) the specific sources of the transaction and financial data (iii) the observed company-by-company financial values, multiples and ratios; (iv) the specific methodology and inputs for determining the Transaction Value and NAV values; (v) the methodology for determining the Low, High, Median and Mean Transaction/NAV multiples of 0.89x, 1.01x, 1.00x, and 0.97x, respectively; (vi) the methodology for determining the Transaction Value/NAV implied reference range of 0.90x–1.00x; and (vii) the methodology for determining the Implied Exchange Ratio Reference Range of 0.211x–0.223x; and

    d. In connection with *Other Information*, the specific rationale for excluding the Marsoft information in the above analyses in light of its use by Blackstone and PJSC.

**Omissions Concerning Potential Conflicts of Interest**

107.    The Registration Statement fails to disclose information that would permit Baltic Trading's stockholders to evaluate the objectivity of the Board. Specifically, the Registration Statement fails to disclose:

    a. All details relating to the Baltic Trading 2010 Equity Incentive Plan along with any alterations made to the Plan during the negotiation of or in anticipation of the Proposed Transaction.

## FIRST CAUSE OF ACTION

## (Brought Against the Individual Defendants and Baltic Trading for Violation of Section 14(a))

108.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

109.    The Individual Defendants and Baltic Trading have caused the Registration Statement to be issued with material omissions and misleading statements.

110.    The Registration Statement is an essential link in the accomplishment of the Proposed Transaction.

111.    In the exercise of reasonable care, the Individual Defendants and Baltic Trading should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render it non-misleading.

112.    The misrepresentations and omissions in the Registration Statement are material to Plaintiff, and Plaintiff will be deprived of his right to make a fully informed decision if such

misrepresentations and omissions are not corrected prior to the vote by shareholders.

## SECOND CAUSE OF ACTION

### (Brought Against the Individual Defendants
### for Violation of Section 20(a))

113.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

114.    The Individual Defendants acted as controlling persons of Baltic Trading within the meaning of § 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of Baltic Trading and their participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

115.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

116.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were all involved in negotiating, reviewing, and approving the Proposed Transaction. The Registration Statement purports to describe the various issues and information that they reviewed and considered,

descriptions which must have had input from the Individual Defendants. The Registration Statement at issue contains the recommendation of all the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of these documents.

117. By virtue of the foregoing, the Individual Defendants have violated § 20(a) of the 1934 Act.

118. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated § 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Individual Defendants are liable pursuant to § 20(a) of the 1934 Act. As a direct and proximate result of the Individual Defendants' conduct, Baltic Trading and its shareholders will be irreparably harmed.

### THIRD CAUSE OF ACTION

### (Against the Individual Defendants for Breach of Fiduciary Duties)

119. Plaintiff repeats and realleges each allegation set forth herein.

120. The Individual Defendants have violated fiduciary duties owed to stockholders of Baltic Trading.

121. By the acts, transactions, and courses of conduct alleged herein, the Individual Defendants have failed to obtain for the stockholders of Baltic Trading the highest value available for Baltic Trading in the marketplace.

122. As demonstrated by the allegations above, the Individual Defendants breached their fiduciary duties owed to the stockholders of Baltic Trading because they failed to take steps to maximize the value of Baltic Trading to its stockholders in the Proposed Transaction.

123. As a result of the actions of defendants, Plaintiff and the Class will suffer

irreparable injury in that they have not and will not receive the highest available value for their equity interest in Baltic Trading. Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the members of the Class.

124.    Plaintiff and the members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from immediate and irreparable injury, which the Individual Defendants' actions threaten to inflict.

## FOURTH CAUSE OF ACTION

### (Against Baltic Trading, Genco, and Merger Sub for Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty)

125.    Plaintiff repeats and realleges each allegation set forth herein.

126.    Baltic Trading, Genco, and Merger Sub are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to the stockholders of Baltic Trading, and are participating in such breaches of fiduciary duties.

127.    Baltic Trading, Genco, and Merger Sub knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein. In so doing, Baltic Trading, Genco, and Merger Sub have rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Transaction in breach of their fiduciary duties.

128.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands relief in his favor and in favor of the Class and against Defendants as follows:

A.    Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class representatives;

B.    Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain a merger agreement providing the best available terms for stockholders;

C.    Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.    Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the wrongdoing;

E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorney' and experts' fees; and

F.    Granting such other and further equitable relief as this Court may deem just and proper.

Dated: May 12, 2015

BROWER PIVEN
A PROFESSIONAL CORPORATION


_____
Brian C. Kerr
475 Park Avenue South, 33rd Floor
New York, NY 10016
Telephone: (212) 501-9000
Facsimile: (212) 501-0300

*Attorney for Plaintiff*

# EXHIBIT A

## PLAINTIFF'S CERTIFICATION

Todd J. Biederman ("Plaintiff") declares that:

1.    I have reviewed the accompanying complaint and have authorized its filing.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. Plaintiff wants to serve as a lead plaintiff in this litigation either individually or as part of a group, and Plaintiff understands that a lead plaintiff is a representative party who must act on behalf of and in the best interests of other class members in directing the action. If Plaintiff is appointed as lead plaintiff individually or as part of a group, Plaintiff is ready, willing and able to diligently fulfill the obligations of a lead plaintiff and representative party.

4.    Plaintiff currently owns 4,100 shares of Baltic Trading Limited.

5.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class under the federal securities laws.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court. Plaintiff understands that this is not a claim form and that Plaintiff's ability to share in any recovery as a member of the class is unaffected by Plaintiff's decision to serve as a representative party. Plaintiff has chosen to seek involvement in this litigation as a Lead Plaintiff in order to choose which counsel will represent Plaintiff and the class.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this  $\cancel{11}^{Th}$  day of _____ May _____ 2015.

_____
Signature   Todd J Biederman

Brower Piven, A Professional Corporation
1925 Old Valley Road
Stevenson, Maryland 21153
Telephone: 410-332-0030
Facsimile: 410-685-1300
www.browerpiven.com